UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| H.L. b/n/f R.L. and J.L. | § | |
| | § | |
| v. | § | CIVIL NO. 4:21-CV-749-SDJ |
| | § | |
| ALLEN INDEPENDENT SCHOOL | § | |
| DISTRICT | § | |

**MEMORANDUM OPINION AND ORDER**

H.L. is an elementary school student in Allen Independent School District (the "District") who receives special education services under the Individuals with Disabilities Education Act ("IDEA") as a child with autism and speech impairment. In January 2021, H.L.'s parents, R.L. and J.L., filed on his behalf a request for a due process hearing, alleging that the District failed to provide H.L. with a free appropriate public education ("FAPE") under the IDEA. A Special Education Hearing Officer ("SEHO") conducted the hearing and determined that the District provided H.L. with a FAPE. Following that decision, H.L., by his next friends and parents R.L. and J.L. ("Plaintiffs"), brought this action against the District challenging the SEHO's decision.

Before the Court are cross-motions for judgment on the administrative record: the District's Motion for Judgment on the Administrative Record, (Dkt. #17); and Plaintiffs' Motion for Judgment on the Administrative Record, (Dkt. #18). The Court, having considered the motions, subsequent briefing, administrative record, and applicable legal authorities, concludes that the District's motion should be

**GRANTED** and Plaintiffs' motion should be **DENIED**.[1] And because the Court resolves herein the parties' entire dispute, Plaintiffs' Unopposed Motion to Set Hearing for Oral Argument, (Dkt. #27), will be **DENIED as moot**.

## I. BACKGROUND

### A. Kindergarten to Second Grade

H.L. has been enrolled in Allen Independent School District since his kindergarten year in August 2017. At the time of the underlying due process hearing leading to this action, H.L. was in third grade at Marion Elementary.

On October 17, 2018, H.L.'s first-grade teacher reported that H.L. struggled completing work, had difficulty focusing and processing information, and required numerous redirections throughout the school day. Accordingly, on February 6, 2019, the District convened a Student Intervention Team ("SIT") meeting. Apart from the SIT chairperson, five additional persons attended the SIT meeting: H.L.'s mother and father, H.L.'s classroom teacher, an administrator, and an educational diagnostician.

At the meeting, concerns about H.L.'s social skills were discussed, and the educational diagnostician explained the characteristics of autism to H.L.'s parents. The District recommended conducting a Full and Individual Initial Special Education Evaluation ("FIE") of H.L. However, H.L.'s parents did not provide their consent to an FIE, stating that they wanted to wait until they received further medical information for H.L. Accordingly, the committee concluded the meeting and

---

[1] Docket #9 comprises the administrative record ("AR"). When citing to the record, the Court cites to the record's internal pagination in the lower right-hand corner of each page, rather than to the CM/ECF document number and page.

recommended reconvening once H.L.'s parents received more detailed information from his doctors.

On January 31, 2020, during H.L.'s second-grade year, the District convened another SIT meeting. At this meeting, the District repeated its concerns and once again recommended conducting a FIE of H.L. At this time, H.L.'s parents provided their consent. Shortly thereafter, in March 2020, all school districts across the state of Texas, including Allen ISD, closed for in-person instruction due to the COVID-19 pandemic. The District remained closed to in-person instruction for the remainder of the 2019–2020 school year.

Nonetheless, H.L.'s FIE was timely completed on April 14, 2020. The evaluators determined that H.L.'s overall level of intellectual functioning "fell within the very superior range," and that H.L.'s academic achievement was "at expected levels given his present grade placement." (AR 0340). The FIE identified various concerns including: "social interactions with peers and adults, focus/attention in the classroom, atypical use of language, sensory concerns, and deficits with fine motor skills." (AR 0340). The evaluators recommended that the Admission Review and Dismissal ("ARD") committee consider H.L.'s eligibility under autism and speech impairment for pragmatic language. The FIE also acknowledged that H.L. regularly exhibits behaviors and difficulties consistent with Attention Deficit Hyperactivity Disorder ("ADHD").

Due to the pandemic-mandated school closures, H.L.'s initial ARD committee meeting was held by teleconference on May 5, 2020. Both H.L.'s parents and H.L.'s

3

grandmother, who serves as H.L.'s advocate, were in attendance. After reviewing H.L.'s FIE, the ARD committee determined that H.L. was eligible for special education and related services under the IDEA as a student with autism and speech impairment. Because H.L.'s doctor did not return the eligibility form, it was determined that H.L. did not meet the criteria for an Other Health Impairment based on the medical diagnosis of ADHD.

The ARD committee acknowledged that the Occupational Therapy ("OT") evaluation could not be completed by the time of the initial ARD committee meeting because of the school closures, but they agreed to complete the evaluation no later than 30 school days after on-campus learning resumed. Plaintiffs verbally requested a functional behavior assessment ("FBA") independent educational evaluation ("IEE") at this ARD meeting. In response to this request, the diagnostician provided H.L.'s parents with a copy of the procedural safeguards on May 8, 2020, indicating that it included information regarding how to request an IEE and provided the contact information for the District's Executive Director of Special Programs.

H.L.'s initial individualized education program ("IEP"), dated May 7, 2020, proposed support for deficits in pragmatic speech and social skills. His goals focused on initiating and maintaining on-topic conversations with peers, participating in nonpreferred conversational topics, answering questions about activities occurring at home and school, and asking follow-up questions or comments in response to peer statements. To support progress on these goals, the IEP proposed direct speech services in the amount of 25 minutes one time per week and direct social skills in the

special education setting in the amount of 30 minutes three times per week. H.L.'s IEP also included supportive accommodations of access to sensory tools, preferential seating, brief movement breaks, extra time to complete assignments, simplified directions, an individual visual schedule, and frequent reminders to stay on task in all subject areas.

Although H.L.'s parents agreed with the eligibility, goals, and schedule of services, they did not waive the five-day waiting period prior to implementation of his initial IEP. As a result, H.L.'s IEP was first implemented on May 15, 2020, and the 2019–2020 school year ended five school days later, on May 22, 2020. Per the District's policy, no speech services were provided in the first and last week of the school year.

**B. Third Grade**

During the first three weeks of the 2020–2021 school year, students continued remote learning, with in-person learning resuming on September 2, 2020. Per District policy, H.L. did not receive speech services during the first week of the school year. H.L. then failed to attend his scheduled speech therapy during the second week.

On August 19, 2020, H.L.'s mother emailed the Speech Language Pathologist ("SLP") to inquire about the attendance policies since H.L. was with his grandfather during the day and was unable to access direct speech therapy through virtual learning. The SLP offered to complete a Temporary Virtual Services Plan ("TVSP") to provide H.L. with consultation speech during at-home learning to prevent him from being marked absent for direct virtual speech services. The SLP explained that direct speech services would resume when in-person learning began again and assured

H.L.'s mother that this would not affect H.L.'s IEP for in-person learning. On August 25, 2020, H.L.'s mother responded, stating: "Yes, you can go ahead and switch [H.L.] to consult-only until face-to-face school resumes." (AR 0418). Accordingly, the District sent an Agreement to Change ("ATC") documenting the TVSP to H.L.'s mother and H.L.'s speech services switched to consult-only for the third and final week of remote instruction.

The first day of in-person instruction occurred on September 2, 2020. H.L. began to receive in-person instruction at that time, including in-person direct speech services. The record reflects that H.L. transitioned back to school easily and his teacher expressed joy in getting to know him in person. As was agreed at the May 5, 2020, ARD meeting, H.L.'s OT evaluation occurred on September 16, 2020. Ultimately, the evaluation concluded that H.L. did not demonstrate a need for OT services.

On December 17, 2020, the District convened a revision ARD committee meeting to review the OT evaluation. After reviewing the OT evaluation and H.L.'s teacher's input, the District members of the ARD committee did not recommend OT services. Nonetheless, the ARD committee provided an accommodation for H.L. to type lengthy assignments. H.L.'s mother and father, through H.L.'s advocate, disagreed with the results of the OT evaluation. At H.L.'s parents' request, an additional accommodation for the use of headphones was added to H.L.'s IEP. Further, because H.L. had mastered all of his speech goals by the time of the meeting, the committee created new IEP goals for H.L. Nonetheless, at H.L.'s parents' request,

the committee also continued the initial speech goals with increased mastery standards.

H.L.'s parents also requested a Behavior Intervention Plan ("BIP") at this ARD meeting. Based on H.L.'s FBA and information from the District's staff, the District's members of the ARD committee rejected this request and proposed conducting another FBA. H.L.'s parents declined and stated an intent to obtain an independent FBA. The ARD committee did not reach consensus on whether H.L. demonstrated a need for a BIP or OT as a related service.

On January 12, 2021, the ARD committee reconvened. Despite verbal agreement to the date at the December 2020 ARD committee meeting, ARD committee notices, and attempts to contact H.L.'s parents at the start of the meeting, H.L.'s parents failed to attend. As such, the ARD committee was not able to address these specific areas of disagreement. The record shows, however, that during this period H.L.'s teachers and service providers discussed how H.L. was continuing to make progress at school and was succeeding with the services in place.

## C. Due Process Hearing

Under the IDEA, the parents of a child with disabilities may file a complaint "with respect to any matter relating to the identification, evaluation, or education placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6). On January 11, 2021, H.L.'s parents filed a request for a due process hearing with the Texas Education Agency ("TEA"), and a hearing was held on May 12, 2021.

On June 30, 2021, the SEHO issued her decision, finding that H.L. had not been denied a FAPE and denying Plaintiffs' request for relief. More specifically, the SEHO made the following findings: (1) H.L. is eligible for special education services as a student with disabilities under the IDEA and the District is responsible for providing H.L. with a FAPE, (2) H.L.'s educational program was appropriate in light of H.L.'s circumstances and provided H.L. with a FAPE, (3) the District unnecessarily delayed its response to H.L.'s parents' request for a FBA Independent Educational Evaluation ("IEE"), but that the delay was a procedural violation that did not deprive H.L. of a FAPE, (4) Plaintiffs failed to prove that the District unilaterally changed H.L.'s IEP, (5) Plaintiffs failed to prove that the District failed to implement H.L.'s IEP, and (6) Plaintiffs failed to prove that the District failed to collaborate or consult with Plaintiffs regarding changes to H.L.'s IEP. (AR 0017–18). The SEHO also ordered the District to provide training to teachers, administrators, and paraprofessionals on IDEA regulations and on District policies and procedures for responses to parental requests for independent education evaluations, including oral requests. (AR 0018).

Any party "aggrieved by the [SEHO's] findings and decision" under the IDEA may file a civil action in federal court. 20 U.S.C. § 1415(i)(2)(A). Plaintiffs filed the present action under § 1415(i)(2), appealing the decision of the SEHO. (Dkt. #1).

## II. LEGAL STANDARD

The IDEA provides "[a]n opportunity for any party to present a complaint with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." 20 U.S.C. § 1415(b)(6)(A). In Texas, a party making such a complaint is entitled to a due process

hearing conducted by the TEA. *See* 20 U.S.C. § 1415(f)(1)(A); 19 Tex. Admin. Code § 89.1151(b) (implementing a one-tier review system under IDEA). A party "aggrieved by the findings" of the TEA may bring an action in state or federal court "with respect to the complaint presented pursuant to this section[.]" 20 U.S.C. § 1415(i)(2)(A). Section 1415(i)(2)(A) thus limits a party's right of action under the IDEA to issues presented at the due process hearing. *See Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist.*, 198 F.3d 648, 655–56 (8th Cir. 1999); *Angela B. v. Dallas Indep. Sch. Dist.*, 3:20-CV-0188-D, 2020 WL 2101228, at *3 (N.D. Tex. May 1, 2020).

This Court's review of the TEA SEHO's decision is "virtually de novo." *H.W. ex rel. Jennie W. v. Comal Indep. Sch. Dist.*, 32 F.4th 454, 464 (5th Cir. 2022) (citation omitted). The Court must receive the state administrative record and must receive additional evidence at the request of either party. *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir. 2003). In an appeal under the IDEA, "summary judgment is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." *Seth B. ex rel. Donald B. v. Orleans Parrish Sch. Bd.*, 810 F.3d 961, 967 (5th Cir. 2016). Accordingly, some courts have referred to the applicable standard of review as "modified de novo." *H.W. ex rel. Jennie W. v. Comal Indep. Sch. Dist.*, No. SA-21-CV-0344-JKP, 2021 WL

3887696, at * 9 (W.D. Tex. Aug. 31, 2021), *aff'd sub nom. H.W. ex rel. Jennie W v. Comal Indep. Sch. Dist.*, 32 F.4th 454 (5th Cir. 2022) (citation omitted).

The SEHO's findings should be accorded due weight, but this Court is to arrive at an independent conclusion based on a preponderance of the evidence. *Adam J.,* 328 F.3d at 808. Nonetheless, "the Supreme Court has cautioned that courts should not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *B. S. ex rel. Justin S. v. Waxahachie Indep. Sch. Dist.*, No. 22-10443, 2023 WL 2609320, at *5 (5th Cir. 2023) (citing *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 404, 137 S.Ct. 988, 197 L.Ed.2d 335 (2017)). Finally, the Court should award "greater deference" to the SEHO's credibility determinations based on live testimony. *B. S.,* 2023 WL 2609320, at *5.

## III.   DISCUSSION

Plaintiffs describe what they perceive to be a number of different procedural and substantive violations of the IDEA by the District, including the failure to: (1) timely identify and evaluate H.L. as a child with disabilities in need of special education services in violation of their child find obligations, (2) develop an IEP that meets H.L.'s unique needs, and, as a result, denying him a FAPE, (3) timely respond to Plaintiffs' request for a FBA IEE, (4) provide a FAPE by not requiring various related services to address H.L.'s needs, (5) implement H.L.'s IEP during COVID-19 closures and remote learning, and (6) collaborate with H.L.'s parents regarding changes made to H.L.'s IEP outside of an ARD committee meeting. Plaintiffs argue that these alleged violations, both individually and in combination, have resulted in the denial of a FAPE to H.L. Ultimately, Plaintiffs make two main arguments: (1) the

District committed a child find violation and (2) the District denied H.L. a FAPE. The Court will address these arguments in turn.

## A. The IDEA

The IDEA "offers States federal funds to assist in educating children with disabilities." *Endrew F.*, 580 U.S. at 386. "The 'cornerstone' of the IDEA is the statutorily mandated 'free appropriate public education.'" *H.W.,* 32 F.4th at 460. As defined in the IDEA, a FAPE comprises both instruction tailored to meet a child's unique needs and sufficient supportive services to permit the child to benefit from that instruction. *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 158, 137 S.Ct. 743, 197 L.Ed. 2d 46 (2017).

"'The primary vehicle' for ensuring that a disabled student receives a FAPE is the creation and implementation of an IEP, which ensures that students receive special education and related services that are 'tailored to the[ir] unique needs.'" *B. S.,* 2023 WL 2609320, at *5 (citation omitted). An IEP is a comprehensive plan that sets out "measurable annual goals, including academic and functional goals." *Endrew F.*, 580 U.S. at 391 (citing § 1414(d)(1)(A)(i)(I)–(III)); *see also Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (describing the IEP as "the centerpiece of the statute's education delivery system for disabled children"); *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 181, 102 S.Ct. 3034, 73 L.Ed. 2d 690 (1982) (describing the IEP as the "means" by which special education and related services are "tailored to the unique needs of a handicapped child").

The IDEA does not require that a disabled child's IEP maximize his potential, but rather that it "guarantees a basic floor of opportunity specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction." *R.H. v. Plano Independent School Dist.*, 607 F.3d 1003, 1008 (5th Cir. 2010) (internal quotation marks and citation omitted). Yet, the educational benefit "cannot be a mere modicum or de minimis; rather, an IEP must be likely to produce progress, not regression or trivial educational advancement." *Id.* (citation omitted).

An IEP is developed at an ARD committee meeting. *See E. R. by E. R. v. Spring Branch Indep. Sch. Dist.,* 909 F.3d 754, 758 (5th Cir. 2018) (citing 20 U.S.C. § 1414(d)). The ARD committee generally consists of "a qualified representative of the local educational agency, the child's teacher, the child's parents or guardian, and, where appropriate, the child." *Rowley*, 458 U.S. at 182. Among other things, ARD committee meetings focus on "the child's present levels of academic achievement and functional performance, and to set future goals" *E. R.,* 909 F.3d at 758 (citing § 1414(d)(1)(A)(i)).

Finally, the school district's IEP is presumed to be appropriate. *R.H.*, 607 F.3d at 1010–11 ("The IDEA creates a presumption in favor of a school district's educational plan, placing the burden of proof, by preponderance of the evidence, on the party challenging it."). As such, the role of a court is "not to second-guess the decisions of school officials or to substitute their plans for the education of disabled students with the court's," but rather "is limited to determining whether those

officials have complied with the IDEA." *Id.* at 1010 (citation omitted). Therefore, when a parent challenges the appropriateness of an IEP, the court's inquiry is twofold: (1) whether the State complied with the procedures set forth in the IDEA, and (2) whether the IEP developed through such procedures is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07. If these requirements are met, the State has complied with its obligations under the IDEA, and the court can require no more. *Id.*

## B. Child Find

Plaintiffs' first main argument is that the District committed a child find violation, a claim that the SEHO dismissed as untimely. (AR 0001, 0009). For the following reasons, the Court affirms the SEHO's finding.

The IDEA sets a default statute of limitations for IDEA claims of two years. 20 U.S.C. § 1415(f)(3)(C). However, the IDEA permits States to deviate from this default time period if they so choose. *See id.* ("A parent or agency shall request an impartial due process hearing within 2 years . . . [unless] the State has an explicit time limitation for requesting such a hearing."). Until recently, Texas chose to exercise this option. Under relevant Texas law at the time of the underlying due process hearing, "[a] parent or public education agency [was required to] request a due process hearing within one year of the date the complainant knew or should have known about the alleged action that serves as the basis for the hearing request." *D.C. v. Klein Indep. Sch. Dist.*, 711 F.Supp.2d 739, 745 (S.D. Tex. May 5, 2010) (quoting 19 TEX. ADMIN. CODE § 89.1151(c)). In 2021, the Texas Legislature extended

13

the applicable statute of limitations to two years when it passed the Edgar H. Pacheco Jr. Act. *See* H.R. 1252, 87th Leg., Reg. Sess. (Tex. 2021).

While Plaintiffs acknowledge that the statute does not apply retroactively to this matter, they ask the Court to be "mindful" of the Texas Legislature's subsequent "intent to lengthen the statute of limitations" for IDEA claims. (Dkt. #18 at 6 n.1). The Pacheco Act was passed two weeks after the administrative proceeding at issue and did not go into effect until more than one year after the hearing, on September 1, 2022. Further, the Act specifically states that complaints filed, and due process hearings requested, before September 1, 2022, "are governed by the law in effect at the time the complaint was filed and the impartial due process hearing was requested" and that the "former law is continued in effect for that purpose." H.R. 1252, 87th Leg., Reg. Sess. (Tex. 2021). Therefore, under a plain reading of the IDEA and Texas's then-effective implementing regulations, all claims that Plaintiffs knew or should have known about prior to January 11, 2020, are time barred.

Alternatively, Plaintiffs argue for the first time on appeal that they are entitled to an exception from the statute of limitations. *See* (Dkt. #18 at 6–7). Under Section 89.1151(d)(2), the one-year statute of limitations does not apply to a parent "if the parent was prevented from filing a request for a due process hearing" due to "the public education agency's withholding of information from the parent that was required by 34 C.F.R., §300.1, et seq. to be provided to the parent." 19 TEX. ADMIN. CODE § 89.1151(d)(2). Plaintiffs argue that they did not receive prior written notice and procedural safeguards from the District after the February 6, 2019, SIT meeting,

14

as required by 34 C.F.R. § 300.503, and thus they should be exempt from the statute of limitations that would otherwise bar them from bringing their child find claims.

However, as the District correctly points out, because Plaintiffs failed to raise this information-withholding claim at the due process hearing, the claim has not been administratively exhausted. Administrative exhaustion "requires more than pleading a claim" in a state complaint or in prehearing briefing, "it requires 'findings and decision' by the administrative body" as to the claims plaintiffs seek to assert in federal court. *Reyes v. Manor Indep. Sch. Dist.*, 850 F.3d 251, 256 (5th Cir. 2017) (quoting 20 U.S.C. § 1415(g)); *see also Blackmon*, 198 F.3d at 655–56 (holding that the failure to properly raise at the administrative level a claim that procedural rights under the IDEA had been violated meant that such claim was barred "unless an exception to the exhaustion rule applies"); *Hooker v. Dallas Indep. Sch. Dist.*, No. 3:09-CV-1289-D, 2010 WL 4025877, at *5 (N.D. Tex. Oct. 13, 2010) (holding that parents failed to exhaust claims not addressed at due process hearing). The IDEA allows for the Court to review evidentiary due process hearings, but it "does not provide for [the Court] to act as the first hearing body." *Papania-Jones v. Dupree*, 275 F. App'x 301, 303 (5th Cir. 2008) (citing 20 U.S.C. § 1415(i)(2)(C)). As the Fifth Circuit has repeatedly emphasized, "the state education agency is best situated to hear and resolve IDEA complaints." *Id.*

In this regard, it is worth noting that the potential assertion of an exception to the applicable statute of limitations was clearly raised at the administrative level. During a prehearing conference, the SEHO attempted to confirm with Plaintiffs'

counsel that the one-year statute of limitations would apply, and that Plaintiffs did not wish to plead an exception. (AR 0001). Further, the SEHO granted Plaintiffs' counsel additional time to confer with Plaintiffs and provide a status report regarding the statute of limitations issue. (AR 0001, 0059, 0067). Plaintiffs' counsel failed to respond by the deadline and never subsequently sought leave to plead an exception to the statute of limitations. Contrary to Plaintiffs' argument that an exception was "clear" from their pleadings, the Court finds that an exception is entirely absent from their pleadings.

Plaintiffs now wish to raise, in this appeal, what they believe is a relevant exception to the application of the statute of limitations. If this Court were to allow Plaintiffs to assert such a claim—that the exception is applicable—it would do so without first allowing the underlying state agency an opportunity to decide the issue. This is not permitted. *See Papania-Jones*, 275 F. App'x at 303. By failing to exhaust the IDEA's administrative remedies, Plaintiffs did not give the State an appropriate opportunity to resolve their complaints. *Id.* at 303–04. The SEHO, not the Court, is the appropriate arbiter for determining whether Plaintiffs are entitled to an exception from the one-year statute of limitations. Therefore, the Court may not determine whether an exception to the statute of limitations applies as this is not a justiciable controversy. *See Gardner v. Sch. Bd. Caddo Parish*, 958 F.2d 108, 112 (5th Cir. 1992) ("[A] complaint based on [the IDEA] is not a justiciable controversy until the plaintiff has exhausted his administrative remedies[.]"); *see also Blackmon*, 198 F.3d at 655 ("[U]nder well-established judicial interpretations of the IDEA,

[plaintiff] had an obligation to exhaust her administrative remedies with regard to the issues upon which she seeks judicial review.").

Regardless, even if the Court were to conclude that an exception to the statute of limitations had been sufficiently raised in the administrative proceeding below such that it was proper for it to be considered at this point, Plaintiffs would still be unable to prove that the District violated their child find obligations. Pursuant to the IDEA's child find provision, a State receiving federal funds must identify, locate, and evaluate children with disabilities who are in need of special education services within a "reasonable time" after the district has notice of facts or behavior likely to indicate a disability. *Spring Branch Indep. Sch. Dist. v. O.W. by Hannah W.*, 961 F.3d 781, 790–91 (5th Cir. 2020); *see also Dallas Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 320 (5th Cir. 2017) ("A school district's child find duty is triggered when the district 'had reason to suspect [the child] had a qualifying disability.'"). While "neither the [IDEA] nor regulations seek to set a time between notice of a qualifying disability and referring the student for an evaluation," the Fifth Circuit "has inferred a 'reasonable-time standard' into the provision." *O.W.,* 961 F.3d at 791 (citation omitted). Ultimately, "[a] finding of a child find violation turns on three inquiries: (1) the date the child find requirement [was] triggered due to notice of a likely disability; (2) the date the child find duty was ultimately satisfied; and (3) the reasonableness of the delay between these two dates." *Id.* at 793 (citation omitted).

Plaintiffs contend that the District was on notice of H.L.'s likely disability as early as October 17, 2018, and that the District waited over a year to refer H.L. to

special education on January 31, 2020, resulting in an unreasonable delay. But the January 31, 2020, SIT meeting that Plaintiffs reference was the *second* SIT meeting. The *first* SIT meeting—initiated by the District—took place on February 6, 2019. The Court finds that the delay between the District's notice and the first SIT meeting to be reasonable.

At the first SIT meeting, the District recommended a FIE of H.L., but H.L.'s parents chose not to provide consent. If a parent declines to provide consent for a special education evaluation after one is offered, a school district does not violate its child find obligations when it decides not to pursue evaluation. *See* 34 C.F.R. § 300.300(a)(3)(i)–(ii); *see also H.W.*, 2021 WL 3887696, at *21 (noting the "discretionary nature of using the override procedures" after a parent declines consent for evaluation). Here, the District opted not to pursue an evaluation of H.L. after H.L.'s parents refused to provide their consent at the first SIT meeting. Because Section 300.300(a)(3)(ii) leaves the decision to use the override procedures provided in Section (a)(3)(i) to the discretion of the school district,[2] the Court finds that the District did not violate its child find obligations by declining to pursue an evaluation of H.L. against his parents' wishes.

When the District again proposed to evaluate H.L. for special education services on January 31, 2020, at the second SIT meeting. H.L.'s parents consented. There is no indication in the record that H.L.'s parents desired to consent in the

---

[2] *See* 34 C.F.R. § 300.300(a)(3)(i)–(ii); *accord* 20 U.S.C. § 1414(a)(1)(D)(ii)(I) ("If the parent of such child does not provide consent for an initial evaluation . . . the local educational agency *may* pursue the initial evaluation of the child by utilizing the procedures described in section 1415 of this title . . . .") (emphasis added).

interim—they never asked for an evaluation or suggested that they might provide their consent if the District were to request to evaluate H.L. a second time. Instead, both the February 2019 and January 2020 SIT meetings were initiated by the District. Therefore, the Court finds that the District fulfilled its child find duties regarding H.L.

## C. Free Appropriate Public Education

Plaintiffs' second main argument is that the District denied H.L. the FAPE to which he is entitled under the IDEA. Plaintiffs continue to bear the burden of proof. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62, 126 S.Ct. 528, 163 L.Ed. 2d 387 (2005).

### i. *Michael F.* Analysis

To evaluate whether a student's IEP is substantively adequate, courts in this circuit employ a four-factor test set forth in *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. ex rel. Barry F.* ("*Michael F.*"), 118 F.3d 245 (5th Cir. 1997). The four *Michael F.* factors include whether "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders;' and (4) positive academic and non-academic benefits are demonstrated." *Id.* at 253; *see also E. R.*, 909 F.3d at 765 ("[The] four *Michael F.* factors and the Supreme Court's holding in *Endrew F.* do not conflict."). While the Fifth Circuit has "long held that the fourth factor is critical," it has "never specified precisely how these factors must be weighed." *H.W.*, 32 F.4th at 465 (citation omitted).

### a. The IEP was Individualized on the Basis of H.L.'s Assessment and Performance

The first *Michael F.* factor evaluates whether H.L.'s IEP was individualized on the basis of his assessments and performance. *Michael F.*, 118 F.3d at 253. The IDEA mandates that, in developing a student's IEP, the ARD committee consider: "(i) the strengths of the child; (ii) the concerns of the parents for enhancing the education of their child; (iii) the results of the initial evaluation or most recent evaluation of the child; and (iv) the academic, developmental, and functional needs of the child." 20 U.S.C. § 1414(d)(3)(A).

The administrative record shows that the ARD committee developed H.L.'s IEP after determining H.L.'s present level of academic achievement and functional performance ("PLAAFP") through his FIE data. H.L.'s PLAAFP considered the cognitive and academic strengths of H.L., providing that he "is very bright and is working on grade level work within the classroom." (AR 0397). Accordingly, no academic needs were identified.

The ARD committee considered H.L.'s strengths and weaknesses, parental concerns, the results of the initial evaluation, and his academic, developmental, and functional needs. (AR 0366–92). Areas of need were identified as social skills/pragmatic language and focus/concentration. (AR 0396–97). The ARD committee addressed these needs with IEP goals, accommodations, direct speech services, and social skills instruction. Some of the IEP goals included: independently asking two follow-up questions to help maintain conversations with peers, engaging in turn-taking skills by attending to peers' conversations and waiting for his turn to

respond, and avoiding identified preferred topics with peers. (AR 0398–0400). Additionally, the committee considered recommendations and developed accommodations based on H.L.'s needs such as access to sensory tools, preferential seating, extra time to complete assignments, directions in small and discrete steps, brief movement breaks, advance warning before being called on, and visual, verbal or tactile reminders to stay on task." (AR 0398).

Although Plaintiffs indicated agreement to H.L.'s initial IEP, they now argue that it was not individualized based on H.L.'s assessments and performance. Specifically, Plaintiffs argue that the District failed to individualize H.L.'s IEP by failing to provide various related services such as OT, speech therapy, and social skills training.[3]

Plaintiffs first argue that H.L.'s IEP was not individualized because the District failed to provide H.L. with OT services. OT "is a related service under the

---

[3] Plaintiffs have also argued that the District's "failure to conduct a parent-training assessment was [a] failure to individualize based on assessment." (Dkt. #20 at ¶14). However, Plaintiffs failed to plead this before the SEHO, and therefore this claim has not been administratively exhausted and is not properly before the Court. *See Papania-Jones*, 275 F. App'x at 303. But even if the claim had been exhausted, it is meritless. As the District has correctly observed, *see* (Dkt. #23 at 12), the record shows that the District repeatedly attempted to obtain information from H.L.'s parents in order to complete the parents training needs assessment, but H.L.'s parents would not cooperate. Absent such cooperation, the District could not complete the Parents Training Needs Assessment. *See* (AR 0478) ("In order to gather more information regarding the student's needs outside school, the school district requested at the student's Annual ARD in the Spring that a Parent Training Needs Assessment be completed. Although teacher information was received, the school did not receive the assessment documents from the parents . . . Ms. Taylor asked that the parents return their portion of the needs assessment, so that it can be completed, and the ARD committee can meet again to review and determine what additional supports may need to be put in place for [H.L.]."); (AR 1126) ("Additionally, the district would like the opportunity to review with the committee the completed Parent Training Needs Assessment provided to the parents. However, despite multiple communication attempts the assessment has not been returned by the parents at this time.").

IDEA, and as such is required when it is necessary for the child to benefit from special education." 71 Fed. Reg. 46,569 (2006). Plaintiffs rely on their private OT evaluation of H.L. to support this argument. Plaintiffs' private OT evaluation reflected that H.L.'s fine and gross motor skills were in the average range. Nonetheless, the evaluator concluded that H.L. would benefit from OT as a related service.

The District also conducted an OT evaluation of H.L. The District's evaluation determined that H.L. exhibited good general fine motor and in-hand skills. The evaluator considered functional classroom and school skills, noting that H.L. demonstrates "functional muscle tone, active range of motion, and strength in which to participate in his school day." (AR 0422). While H.L.'s handwriting rate was determined to be slower than his peers, it was legible and readable. As such, the ability to type long writing assignments was recommended to accommodate his slower handwriting rate. The evaluator also recommended strengthening exercises to address H.L.'s overall generalized weakness and low muscle tone, along with sensory breaks to address his difficulty with maintaining attention and alertness.

Nevertheless, because H.L. was found to be functional in the school setting, the evaluator ultimately concluded that H.L. did not require OT services to assist him in the educational environment. And while OT services were not required under the District's evaluation, access to sensory tools was included in H.L.'s initial IEP along with an accommodation allowing H.L. to type lengthy assignments. Plaintiffs have failed to carry their burden of proving that H.L. did not receive a benefit from special

education as a result of not obtaining OT services. Therefore, the Court agrees with the SEHO's finding that H.L. did not require OT services.

Plaintiffs next argue that H.L.'s speech services were not appropriate to meet his needs, relying on a private speech evaluation to argue that he required twice the amount of speech services that he received in his IEP. However, the administrative record shows that H.L. made rapid progress with the speech services he received. H.L.'s SLP testified that H.L. is "like my model student out of everyone" in her speech class, that he's "always engaged." (AR 1615). Importantly, she also noted that "he seems to really understand the purpose of what we're doing . . . and he applies it." (AR 1616). Indeed, H.L. had mastered all of his speech goals by the time of the ARD committee meeting in December 2020, when new goals were added and mastery criteria were increased on pre-existing goals. By the time of the due process hearing, H.L. had mastered all but one of his goals. (AR 1627). The record clearly shows that H.L. has exceeded expectations in regard to his speech therapy and Plaintiffs are unable to carry their burden of proving that H.L. required additional speech services to make progress.

Thus, Plaintiffs have failed to carry their burden of showing that H.L.'s IEP was not individualized based on his assessments and performance. Accordingly, this factor weighs in favor of the District.

### b. The IEP was Implemented in the Least Restrictive Environment

The second *Michael F.* factor concerns whether the IEP was administered in the least restrictive environment. *Michael F.*, 118 F.3d at 253. Essentially, the IDEA

seeks to ensure that, to the maximum extent appropriate, children with disabilities are educated with children who are not disabled. *See* 20 U.S.C. § 1412(a)(5)(A). Here, apart from speech services and social skills instruction, H.L. has been educated in the general education setting.

The SEHO determined that the District complied with the IDEA's least restrictive environment requirement for H.L., (AR 0016), and Plaintiffs do not contest this finding, (Dkt. #18 at 29). Thus, neither party disputes that the general education environment was the appropriate environment for H.L. The Court disagrees with Plaintiffs' contention that this factor thus "should not be considered in the analysis of the *Michael F.* factors." (Dkt. #18 at 29). Rather, the Court considers this factor in its analysis and concludes that it weighs in favor of the District.

### c. Services were Provided in a Coordinated and Collaborative Manner

The third *Michael F.* factor examines whether the services were provided in a coordinated and collaborative manner that includes the key stakeholders. The IDEA contemplates a collaborative process between the district and the parents. *R.H.*, 607 F.3d at 1008. The key stakeholders in this context are H.L.'s close family members, plus the school employees most central to his education, such as general and special education teachers, administrators, therapists, and behavioral specialists. *See H.W.*, 32 F.4th at 465.

The record establishes that H.L.'s key stakeholders were major participants in the development of H.L.'s IEP and related services. The ARD committee overseeing H.L.'s IEP was comprised of H.L.'s mother, H.L.'s father, H.L.'s grandmother, an

educational diagnostician, a licensed specialist in school pathology, H.L.'s principal, a special education teacher, a lead speech pathologist, and the general education teacher. (AR 0386). As such, the District relied on numerous professionals and teachers, in addition to obtaining input from H.L.'s parents and grandmother, to best meet H.L.'s needs.

The record is replete with evidence showing that throughout H.L.'s time receiving special education services, the District actively communicated and collaborated with H.L.'s parents. Additionally, there are numerous examples of ways in which the District accommodated specific requests of H.L.'s parents regarding his special education services. For example, the District granted H.L.'s parents' requests for an accommodation allowing H.L. to utilize headphones in the classroom. Also, at H.L.'s parents' request, mastery criteria were increased on pre-existing goals instead of disposing of them.

Even when there was occasional disagreement between the District and H.L.'s parents, the record shows that the District's staff worked together with H.L.'s parents to address H.L.'s needs. *See supra* Part I. In this regard, the Fifth Circuit has made clear that the right to provide meaningful input is not the right to dictate the outcome. *White ex rel. White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003) (rejecting "the assertion that parents are denied input into a decision if their position is not adopted"). Here, the Court finds ample evidence in the record that the District

properly coordinated and collaborated with H.L.'s parents and therefore this factor weighs in favor of the District.[4]

### d. H.L. Demonstrated Positive Academic and Non-Academic Benefits under his IEP

The final *Michael F.* factor addresses whether H.L. demonstrated positive academic and non-academic benefits under his IEP. This is arguably the most critical factor in the analysis. *R.P. ex rel. R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 813–14 (5th Cir. 2012). Evidence of an academic benefit militates in favor of a finding that an IEP is appropriate. *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 399 (5th Cir. 2012).

To determine whether H.L. has received a meaningful educational benefit, the Court must analyze his overall academic record. *See id.* at 397–98. The Court may consider H.L.'s progress on his IEP goals and objectives, test scores, and percentile rankings but "no one factor can overwhelm it." *H.W.*, 32 F.4th at 469. Instead of comparing H.L. to his typically developing peers, the Court must determine whether H.L. is receiving an educational benefit by assessing his individual progress. *See Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1047 (5th Cir. 1989).

---

[4] Plaintiffs have also argued that the District's failure to complete a Parents Training Needs Assessment proves that H.L.'s services were not provided in a coordinated and collaborative manner. (Dkt. #18 at 26). As noted herein, *see supra* note 3, Plaintiffs failed to plead this before the SEHO, and therefore this claim has not been administratively exhausted and is not properly before the Court. *See Papania-Jones*, 275 F. App'x at 303. But even if the claim had been exhausted, it is meritless. The record shows that the District repeatedly attempted to obtain information from H.L.'s parents in order to complete the parents training needs assessment, but H.L.'s parents would not cooperate. *See supra* note 3. Thus, if anything, the record highlights the District's attempts to collaborate with H.L.'s parents and H.L.'s parents' unwillingness to do so.

The Court finds ample evidence in the record to conclude that H.L. received both academic and non-academic benefits under his IEP. H.L.'s overall achievement levels are in the high average level in most all subjects. H.L.'s report cards for both the 2019–2020 and 2020–2021 school year reflect straight As in all subject areas. (AR 0498–99). H.L.'s reading, math, science, and English language arts benchmark Measures of Academic Progress ("MAP") growth skills are also consistently in the high average range. (AR 0502–12). H.L.'s third grade teacher testified that his overall academic performance is "higher than his peers." (AR 1567). Regarding math, H.L.'s teacher testified that he "is consistent[ly] above the norm for his age" and that "he is doing very, very well." (AR 1567).

Further, the record provides abundant evidence that H.L. has received non-academic benefits under his IEPs. H.L.'s IEP progress reports indicated mastery of all of his social skills goals by the time of the underlying due process hearing. H.L.'s teacher testified that he was experiencing "tremendous growth," had become more comfortable playing with his peers in recess, and had become excited about working on projects with his peers. (AR 1568). Even with nonpreferred topics or activities, H.L. had improved in interactions with his peers. Additionally, H.L. was well-behaved at school. H.L.'s teacher testified that he did not have behavioral issues that interfered with his learning or that required interventions beyond what was included in his IEP. (AR 1571, 1581). H.L. responded positively to teacher redirection and correction. H.L.'s teacher noted that he failed to comply with her instructions only

once during the entire 2021–2022 school year, and he never received a behavior referral. (AR 0497).

In terms of his speech goals, H.L. also exceeded expectations. By the time the ARD committee reconvened in December 2020, H.L. had mastered all of his speech goals. As such, the ARD committee provided H.L. with new goals, and, at the request of H.L.'s parents, mastery criteria were increased on pre-existing goals. By the time of the due process hearing, H.L. had already mastered all but one of his seven speech goals. The Court rejects Plaintiffs' argument that failure to master one speech goal within a five-month period proves by a preponderance of the evidence that H.L. did not benefit under his IEP.

Plaintiffs direct the Court to H.L.'s third grade standardized test scores, specifically his 2021 State of Texas Assessments of Academic Readiness ("STAAR") results and Spring 2020–2021 MAP Growth Student Summary, to support their argument that H.L. did not receive academic benefits under his IEP. Specifically, Plaintiffs focus on H.L.'s STAAR reading scores, which allegedly show that H.L. did not meet the state standard for reading during his third-grade year. Plaintiffs also claim that H.L.'s MAP Growth Student Summary shows that he did not meet projected term-to-term growth in reading and showed a low growth quintile.

Since these records were created after the conclusion of the due process hearing, they were not considered by the SEHO, but were admitted by the Court as additional evidence. Even when considering these standardized test scores, Plaintiffs still cannot meet their burden of showing that H.L. did not receive any academic and

non-academic benefits under his IEP. As the District correctly points out, the STAAR results are the only piece of evidence in the record indicating that H.L. was not making grade level progress in reading. And, in contrast to Plaintiffs' assertions, the MAP Growth Summary indicates that H.L.'s reading achievement level at the end of his third-grade year was "average," and that his instructional area achievement levels were either average or high average. (Dkt. #16-2). Therefore, the results from these standardized tests do not prove that H.L. has not received academic benefits from his IEP.

It is not necessary for H.L. to improve in every area to show that his IEP conferred a benefit. *See Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 350 (5th Cir. 2000). This is because the IDEA guarantees an appropriate education, not a perfect education. *See Adam J.*, 328 F.3d at 808–09. The preponderance of the evidence in the administrative record reflects that H.L. demonstrated positive academic and non-academic benefits under his IEP. Accordingly, the fourth and "most critical" *Michael F.* factor supports the SEHO's decision that the District provided H.L. with a FAPE.

Having considered the four *Michael F.* factors, the Court concludes that H.L.'s IEP was reasonably calculated for him to receive meaningful education benefits and provided him with a FAPE in accordance with the IDEA. The Court affirms the decision of the SEHO in the underlying due process hearing.

### ii. Implementation of the IEP

Plaintiffs also allege that H.L. was denied a FAPE by the District's failure to implement his IEP. Specifically, Plaintiffs take issue with the District's

implementation of H.L.'s speech services. Under the IDEA, "a party challenging the implementation of an IEP must show more than a de minimis failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP." *Bobby R.*, 200 F.3d at 349. This approach intentionally "affords local agencies some flexibility in implementing IEP[s]" while also holding "those agencies accountable for material failures and for providing the disabled child a meaningful educational benefit." *Id.* The Court agrees with the SEHO that Plaintiffs have failed to carry this burden.

First, Plaintiffs complain that the District's Agreement to Change ("ATC") documenting H.L.'s parents' agreement to a change to the Temporary Virtual Services Plan ("TVSP") at the beginning of the 2020–2021 school year, *see supra* Part I, was effectively "unilateral," "something less than an ARD," and amounted to a violation of the parents' rights. This complaint is both legally and factually flawed. The ATC does not run afoul of the IDEA because parents and school districts are permitted to make changes to an IEP by agreement and without the need for an ARD meeting. *See* 34 C.F.R. § 300.324(a)(4), (6). The record shows that this is precisely what occurred here. Recall that H.L.'s mother agreed in writing to a change to the TVSP regarding speech services for H.L. *See supra* Part I. And the document makes the nature of the agreed-upon change quite clear—the alteration changed H.L.'s speech services to consultation when H.L. was receiving virtual speech services but had no impact on his IEP implementation and direct speech services when H.L.

30

received in-person instruction.[5] In short, this change, which allowed H.L. to receive consult speech services whenever at-home learning was taking place, did not amount to a failure of the District to implement *substantial* or *significant* provisions of H.L.'s IEP, as is required to prove a violation of the IDEA.[6]

To support their argument, Plaintiffs focus on an error in the document created by the District to memorialize this change in services, which incorrectly stated that an ARD meeting was held to discuss this change. While the way in which this change was documented was flawed, and, as stated by the SEHO, could have amounted to a procedural violation of the IDEA, Plaintiffs failed to plead this as a procedural violation. Thus, this claim has not been administratively exhausted and is not properly before the Court. *See Papania-Jones*, 275 F. App'x at 303.

Even if this argument were properly before the Court, Plaintiffs could not prove that this procedural misstep is actionable under the IDEA. The IDEA includes both procedural and substantive requirements. *B. S.,* 2023 WL 2609320, at *5. The standard for claims of procedural violations under the IDEA differs from the standard for substantive violations. *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.,* 550 U.S. 516, 525–26 (2007). Liability under the IDEA may not be predicated solely

---

[5] The relevant language in the document reads as follows: "This Agreement to Change (ATC) will amend the current ARD dated 05/07/2020. The purpose of this Agreement to Change (ATC) is to document the Temporary Virtual Services Plan (TVSP) that will be utilized while [H.L.] is receiving services in a virtual classroom setting. The parent was contacted on 08/17/2020 by Jamie Sutherland and they are in agreement with the proposed changes." (AR 0411).

[6] Notably, this change in speech services lasted for merely one week before the District resumed in-person instruction.

on a procedural error absent evidence that the procedural error (1) impeded H.L.'s right to a FAPE; (2) significantly impeded his parents' opportunity to participate in the IEP process; or (3) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(iii). Put simply, Plaintiffs cannot credibly argue that this change significantly impeded H.L.'s parents' opportunity to participate in the decision-making process, particularly given that the change was the product of collaboration between the District and H.L.'s parents. Likewise, Plaintiffs cannot credibly argue that a one-week alteration in services deprived H.L. of an educational benefit or denied H.L. of a FAPE.[7]

Second, Plaintiffs argue that the District failed to implement H.L.'s IEP by failing to provide speech services at the end of May 2020 and at the beginning of the 2020–2021 school year. The Court agrees with the SEHO's finding that, even if the District was required to provide speech services during the four weeks at issue, such a failure to implement H.L.'s IEP was a de minimus failure to implement all elements of H.L.'s IEP. The SEHO found that the testimony established that H.L. received a FAPE as was reflected by his mastery of his speech goals. (AR 0010). The Court not only gives this finding of the SEHO great deference but also reaches this conclusion

---

[7] Relatedly, Plaintiffs argue that H.L.'s father was denied the opportunity to participate in the decision-making process because he was not included in the email exchange between H.L.'s mother and the SLP. But as the SEHO stated, "[t]here was no convincing testimony to support [the assertion] that [H.L.'s] father did not know about the [change] after [H.L.'s] mother agreed to the change." (AR 0011). As noted herein, see supra Part II, the Court must give great deference to the SEHO's determinations based on live testimony. B. S., 2023 WL 2609320, at *5. Further, the burden is on Plaintiffs to establish that a violation has occurred, and Plaintiffs have not shown how this alleged exclusion of H.L.'s father significantly impeded his opportunity to participate in the decision-making process.

after an independent review of the administrative record. Therefore, Plaintiffs have failed to prove that the District failed to implement H.L.'s IEP in violation of the IDEA.

### iii. The District's Delayed Response to Requested FBA IEE

Finally, Plaintiffs argue that the District committed a procedural violation of the IDEA by unreasonably delaying its response to Plaintiffs' FBA IEE request, resulting in the denial of a FAPE to H.L. The SEHO acknowledged a procedural error based upon the District's delay in providing IEE information to Plaintiff. (AR 0017). However, the SEHO determined that no substantive educational harm was caused to H.L. as a result of this procedural violation. (AR 0017). The Court agrees with these findings of the SEHO.

Plaintiffs orally requested an FBA IEE at the May 5, 2020, ARD meeting. In response to this request, the diagnostician provided H.L.'s parents with a copy of the procedural safeguards on May 8, 2020, indicating that it provided information regarding how to request an IEE and providing the contact information for the District's Executive Director of Special Programs. H.L.'s advocate followed up regarding the IEE and the selection of an independent FBA provider for the first time on November 24, 2020. After receiving consent to speak to Plaintiffs' advocate, the District responded and provided the IEE criteria on December 9, 2020. Once Plaintiffs selected the provider, the record reflects that the District worked with the provider to schedule classroom observations and facilitate the completion of the IEE. The IEE FBA report was completed on March 15, 2021. At the time of the due process hearing, the IEE had not been reviewed in ARD.

If a parent requests an IEE at public expense, the public agency must provide the parents with information about where an IEE may be obtained and the agency criteria applicable for IEEs. 34 C.F.R. § 300.502(a)(2). Additionally, "without unnecessary delay" the public agency must either (1) file a due process hearing complaint to show that its evaluation is appropriate or (2) ensure that an IEE is provided at public expense. 34 C.F.R. § 300.502(b)(2)(i)–(ii). Following Plaintiffs' request for an FBA IEE, the District delayed providing information about where an IEE could be obtained and the agency criteria applicable for IEEs. The District also did not file a due process complaint or ensure that an IEE was provided at public expense until December 2020. Accordingly, it is clear that the District committed a procedural violation of the IDEA by unnecessarily delaying its response to H.L.'s parents' request for an FBA IEE.

Nevertheless, the Court agrees with the SEHO that Plaintiffs have failed to meet their burden of proving this procedural violation caused a denial of a FAPE to H.L. Specifically, Plaintiffs have failed to show that the delay significantly impeded H.L.'s parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to H.L. Plaintiffs merely assert that if the District had timely responded to their request, "the issues could have been discussed at ARD, the ARD committee could have collaborated on these issues and the recommendations could have been incorporated in H.L.'s IEP." (Dkt #18 at 22–23).

However, the District's delay does not negate the abundance of evidence in the record of H.L.'s parents and the District actively coordinating and collaborating on

H.L.'s IEP. H.L.'s parents attended and played an active role in H.L.'s SIT meetings and ARD committee meetings, and they helped develop H.L.'s goals and proposed various accommodations that were incorporated by the committee into H.L.'s IEP. There is also evidence that H.L.'s parents were communicating with the District during this seven-month delay about solutions for H.L.'s remote speech services.

Additionally, Plaintiffs failed to show that a delayed FBA IEE caused a deprivation of educational benefit to H.L. As the SEHO noted, H.L. continued to receive numerous supports and accommodations throughout this seven-month period, including some of the same recommendations that were ultimately included in the FBA IEE, such as social skills instruction and a token award system. H.L.'s teacher testified at the hearing that although the IEE had not yet been reviewed in ARD, some of the IEE recommendations were already being provided to H.L. in class, and that the remaining recommendations were inappropriate or unnecessary for H.L.'s progress. Ultimately, Plaintiffs failed to demonstrate that H.L. was denied a FAPE as a result of any data or information included in the IEE. Rather, the record shows that H.L. continued to make academic and non-academic progress before, during, and after the IEE was completed. Thus, this procedural error is not actionable under the IDEA.

## IV. CONCLUSION

The Court concludes that the District provided H.L. with a FAPE and the related services to which he is entitled under the IDEA. Therefore, the Court affirms the decision of the SEHO in the underlying due process hearing. Accordingly, the Court grants the District's Motion for Judgment on the Administrative Record,

(Dkt. #17), and denies Plaintiffs' Motion for Judgment on the Administrative Record, (Dkt. #18).

It is therefore **ORDERED** that the District's Motion for Judgment on the Administrative Record, (Dkt. #17), is **GRANTED**.

It is further **ORDERED** that Plaintiffs' Motion for Judgment on the Administrative Record, (Dkt. #18), is **DENIED**.

It is further **ORDERED** that Plaintiffs' Unopposed Motion to Set Hearing for Oral Argument, (Dkt. #27), is **DENIED as moot**.

**So ORDERED and SIGNED this 15th day of December, 2023.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE